The next case this morning is 52030338 people versus Burton arguing for the defendant appellant is Veronica Shaheen arguing for the state appellee is Pamela Wells, each side will have 10 minutes for the argument the appellant will also have five minutes for rebuttal, please don't only the clerk is permitted to record these proceedings. Morning Council. A couple things. First of all, thank you for your patience. That last case was had a lot to it, let's just leave it at that and took it longer than than we expected. But I believe the appellant in this particular matter if I'm my notes are correct here had filed a motion to cite additional authority. In the last few days, referencing the case. I think that may have come out. February, March, I think we discussed that earlier. At this point, the court is going to deny that motion. But I wanted to get that on the record. Before we get started. So with that being said, Miss Shaheen if you're ready. Go ahead with your argument. May it please the court. Good morning. My name is Veronica Shaheen. I'm with the Office of the State Appellate Defender and I represent appellant Joshua Burton. I'm going to focus on the Fourth Amendment issue with the prolonged traffic stop. The main question in this case is whether the trial court should have granted Joshua Burton's motion to quash arrest arrest and suppress evidence where the officer prolong the traffic stop for a canine sniff. Because Officer Johnson did not have reasonable suspicion to prolong the stop and expand the scope of the of the traffic stop beyond its ordinary traffic mission. The trial court should have found that my clients rights to be free from unreasonable searches and seizures under the Fourth Amendment were violated and therefore it should have granted his motion to suppress. The law is clear on this matter. An officer may not stop a driver for longer than is necessary to complete investigating the traffic stop. Courts have determined certain tasks that are considered incident to traffic stops and ordinary parts of traffic stops. They include checking a driver's license, determining whether the occupants have outstanding warrants, checking auto insurance and checking registration. Can I stop you for one second, please? And can you just very, very quickly or briefly tell us what the standard of review you suggest is on this issue? What our standard is? The standard of review is de novo. Your Honor, we argued de novo because of the video in this case, puts the court at the same position as the trial court. So a canine sniff is not incident to a normal traffic stop. This is settled law. And because of that, it needs to be based. A call to the canine unit needs to be based on reasonable, articulable suspicion. Otherwise, it's based on a mere hunch. And that's exactly what happened here. Officer Johnson called the canine unit based on a mere hunch. When Officer Johnson stopped my client in a gas station parking lot, my client was the passenger of a rental car. Officer Johnson collected the identifying information from both Mr. Burton and the driver Schrader. He also got the registration for the rental car. He then communicated that to dispatch. Dispatch got back to him and told him that Schrader did not have any warrants and she had a valid license. They told him that Mr. Burton did not have any warrants and his license was revoked. And they told him that the registration of the rental car was clear. You said that when they when you pull them over, the defendant was the passenger in the car. And as I understand it, that is accurate. However, it's somewhat leaving out the point that he witnessed the defendant driving the vehicle until they switched positions. He and the passenger at that time switched positions. So he was aware that he was driving when he found out that the defendant's license was revoked. Is that correct? He was aware of previously that the defendant had driven at this time. At the time that he approached them, he was the passenger. I understand that. But what I'm saying is he during this whole incident, the officer observed the defendant driving the vehicle. And then he observed the party switch seats in a gas station parking lot. And then when he pulled him over, the defendant was no longer driving. But when his record came back, he was informed that that defendant's license was revoked. That's correct, Your Honor. And we did argue in our brief that the switching of seats was unremarkable under Timpson, where there was where there's not a roadblock coming up. It's just a mere hunch that someone might have a revoked license. But, Your Honor, after he got the information from dispatch, Officer Johnson made two calls to Hertz rental car company. Let me stop you one more time, because with that last statement he made, it implies that the reason for the stop was because the officer saw them switch seats to avoid, you know, in the cases you're referring to a roadblock or whatnot. This officer didn't make the stop for that reason. He had articulable reason to stop the vehicle for traffic violations and an incident to the stop running the record of both parties. The occupants of the vehicle learned that the passenger was revoked. And so then upon learning that, and also knowing that he was driving previously, that within the previous few minutes, I don't think it's got anything to do with the reason he stopped the vehicle was because of the switching of seats. Is that your understanding as well? Yes, Your Honor. That's my understanding too. I just wanted to clarify that because the state does cite to it as part of the reason for the reasonable suspicion, which I'm going to get into next. Reasonable suspicion for perhaps that he was carrying contraband or that he was hiding something not for stopping the vehicle. Correct. Not for stopping the vehicle. Reasonable suspicion to prolong the stop. Okay, so after he had had a reasonable reason to stop the vehicle, those traffic violations that the woman driving committed, then he found out additional reasons to be suspicious of or to investigate further based on the driving that the defendant was driving with a revoked license. The state's position is that it contributes to reasonable suspicion. My argument is that it doesn't in this case because it was an unremarkable act because even Officer Johnson admits that he didn't observe Mr. Burton make any traffic infractions prior to that. So it was an unremarkable act switching seats in this case. Okay, but you're referring, correct me if I'm wrong, my understanding of what you're suggesting is that the act of switching seats is unremarkable. Correct. The fact that, and I don't disagree with you on that, what I'm suggesting is that occurred and he didn't make a stop because of that reason. The additional investigation was warranted perhaps, and I think this is kind of the state's position, after he learned that the person he saw driving the vehicle earlier was driving on a revoked license. And so while it may not have been a remarkable event for them to switch seats at the time because he didn't know that that driver's license was revoked, after he learned that it was revoked, does maybe raise suspicion as to why he switched seats at that time? Is that fair? I would say it's still unremarkable because people switch seats all the time for many different reasons. I know that they… The fact that the defendant saw, the officer's testimony was that when he was following the vehicle while the defendant was driving, the defendant was eyeballing him in the rearview mirror, seeing that he was being followed by a police officer. And then, you know, he switched seats with the other person. Again, the officer at that time had no idea that that defendant's license was revoked, so he didn't stop him when he saw him get out of the vehicle or switch seats with the other passenger. But after he learned that the license had been revoked and he realized and saw the defendant driving previously, that could be a reason, a remarkable reason for, you know, it's not just a standard, I just want to, I don't feel like driving anymore. I think that raises suspicion in the officer's mind as to, okay, something's going on here, you knew you were driving on a revoked license, you saw me, then you switched, you know, I stopped the vehicle for a different reason. Is that too much emphasis on the fact that the officer later learned that the defendant was driving on a revoked license? I would say yes, because we don't need to wonder what Officer Johnson based his reasonable suspicions on. He testified to it, and he also said, made statements at the scene that are on video. For example, he stated that at a certain point, he, after he called Hertz the second time, he was no longer investigating the traffic matter, he was investigating contraband at that point. He testified to that. He also stated to Mr. Burton, when he asked Mr. Burton out of the car, and Mr. Burton said, am I being detained? He said, not under arrest, you're just detained. Mr. Burton asked him, why am I being detained? He said, it's not your driving. So we know that he didn't base the reasonable suspicion on the switching of seats. But he also said that part of his reason for stating that was to de-escalate any situation that was going on, is that correct? That is correct. Well, he stated that he didn't immediately arrest Mr. Burton because he was trying to alleviate tensions. But if you watch the video, it's not a very tense scene. The parties are very polite to each other. They're answering questions when asked. They're not putting up a fight, getting out of the car. It's not a tense scene. So I believe the video refutes that. Okay. So may I just conclude briefly? No, go right ahead. Thank you. Justice Duhey, please allow her a little extra time since I've used so much of it on one issue. I will. This is becoming a theme for the day. Yeah, this is what happened in the last case. But obviously, counsel, we want both of you to have ample time to flesh out your argument. So go right ahead. And if you have anything else, Ms. Shaheen, go right ahead. Okay. So despite Officer Johnson's own admission, which he stated on the stand additionally and critically, that this wasn't just a normal traffic stop, I was also building my reasonable suspicion. So he admits that he didn't have reasonable suspicion. He was manipulating. Well, he was trying to create reasonable suspicion. Not to parse words, but if he said that he was building his reasonable suspicion, it doesn't mean that he was creating it. He already had some, and he was building upon it. Isn't that what he's saying? But at this point, he had already called for the K-9 unit and detoured from the mission of the stop. So his admission here is significant because… And that's what I was getting to when I was pointing out that after he learned that the driver, who he previously seen driving, had a revoked license, abandoning the original purpose for the stop being stopping, I forget what her name was, for the minor traffic infractions, was it not permissible for him to move on to his newly found reason for investigating further, that being that Bennett had a driver's license that was revoked, that he was on parole, and that they were in a non-drug area? So it was impermissible because he's prolonging the stop. At the 14-minute mark, the stop could have been resolved. At that time, he knew that Schrader, who was the driver at that time, his license was valid, that she had no warrants. He knew that Mr. Burton had no warrants and that his license was revoked. He knew that the car had not been reported stolen. And the traffic stop could have been resolved at that time, but instead he delayed it by a further 18 minutes for the canine sniff. And during that time, he asked questions that were completely unrelated to traffic to Schrader, asking about how does she know Mr. Burton, asking about what they're going to be doing at their destination. Didn't that raise some suspicion, especially the question, how do you know Mr. Burton? Well, hesitation, we're dating, hesitation, I work for him. And then Mr. Burton saying, oh, I'm here looking for work. Well, how are you working for somebody that doesn't have work? I mean, isn't that all creating some suspicion in the officer's mind as to what's going on there? Your Honor, I believe that it does not create reasonable suspicion. I'd be suspicious. I'm sorry? I'd be suspicious with those answers. Maybe I'm not reasonable, but go on, just go ahead. The reasonable suspicion must be based on reasonable inferences of criminal wrongdoing. So in the briefs, I argued that each point that the state points to for reasonable suspicion, individually, they don't hold up. And when each point individually doesn't hold up, they also come together to be nothing. So the totality of the circumstances also comes together to be nothing. And a lot of the things that the state points to are either refuted by the video or mischaracterizations of testimony. For example, it was testified to that Schrader was very nervous and Burton was calm, but that was refuted on the video. Schrader answers questions without hesitation. She's laughing. She's not nervous. The discrepancy in the answers from Officer Johnson to Officer Johnson between Schrader and Burton was refuted by the video. They both said the same location. And then, you know, your point about the area of drug trafficking, they weren't even on the street that is apparently the street that's associated with drug trafficking. And also, courts have held that simply being in a neighborhood that's known for a certain crime cannot sustain reasonable suspicion for that crime. Also, I think it's important to note that courts in the past, when they've been presented with a list of certain factors that are supposed to support reasonable suspicion, they have decided against it, even when it's a long list. For example, in People v. Ruffin, in that case, the defendant was driving a rental car. He appeared nervous as well. He was traveling from California to New York after visiting Mexico, and there were inconsistent statements between the passenger and the driver. And also, in People v. Baldwin, there was no reasonable suspicion where the defendant was nervous and heavy breathing. There was a faint odor of alcohol, and the defendant reached into his pocket. So the court has in the past refused to find reasonable suspicion, even when there's a long list of factors. That's not an immediate reasonable suspicion. And in this case, it's not, because individually, each of these can be essentially debunked. And when they come together, like the court held in People v. Slaymaker, when you add nothing to nothing, you still get nothing. So, and I just want to address parole for just one moment. The state never raised that below, so that issue has been forfeited. But it fails in the merits, too, because the reason for the search of a parolee, if it's justified by the parole status, has to be because they were on parole. It can't just be an unlawful search, and then you say, oh, well, they're on parole. And also, Officer Johnson never said he searched him because of parole, and he didn't know the details of Mr. Burton's mandatory supervised release. And not all mandatory supervised release conditions include consenting to search. So, most importantly, the officer did not have reasonable suspicion in this case. He prolonged the stop by 18 minutes. He conducted a fishing expedition. He violated my client's Fourth Amendment right to be free from unreasonable searches and seizures. And the trial court should have granted his motion to quash arrest. And for these reasons, we respectfully request this honorable court overturn his conviction outright. Thank you, counsel. Before we move to Ms. Wells, Justice Vaughn or Justice Barberis, do you have any questions? I do not. No questions. Okay. Obviously, you'll have your time for rebuttal. Ms. Wells, go right ahead. Thank you, Your Honor's counsel. May it please the court. I want to start with the second part of the admonishments issue because if, in fact, the court follows Mueller, which says that you waive all non-jurisdictional issues by stipulating that the evidence is sufficient to convict, which is what happened here. The people have to concede that is what happened here. If you follow Mueller, you don't even reach the Fourth Amendment issue as Mueller held. Counsel for the defendant or the defendant himself has indicated in their reply brief and in their original brief as to issue two, they want the court to follow Weaver and Villareal. However, they do not address how that affects the 605C admonishments. I want to raise that and make sure that the court understands that to be consistent, you have to apply that standard both ways. So if the court is going to follow Mueller, then you don't even reach the Fourth Amendment issue. We do believe Mueller was based on the Gonzales case. Gonzales was a second district case. Later in Villareal, which was just last year, the second district, the same district disavowed. Gonzales went back to their finding in Bond and said they had read Horton too expansively and therefore 605D does not apply, which means you don't have to give the 605B and C admonishments. You go with 605A. Defendant has not raised that the 605A admonishments were insufficient. He did file a post-trial motion. And therefore, the standard that is longstanding, which is if you're not prejudiced, if there is substantial compliance because we believe 605A applies, we believe that the admonishments were proper in this case. With that being said, I will move on to the second issue, which is the Fourth Amendment issue. Our main point on this is that there was reasonable suspicion, and that is actually what the judge found. The findings of fact, and we, I will address the standard of review. I disagree that it is a de novo review overall. It is a de novo review as to the ultimate finding. However, it is against the manifest weight of the evidence as to the factual findings. The court made specific factual findings, and those are found at page C75 of the record. And I do believe that unless those are against the manifest weight of the evidence, the court has to, this court has to defer to those. And it's not just based on the video. It's based on the officer's testimony as to what he observed prior to the video even starting, which is he observed the defendant driving the vehicle in question, that the driving privileges were suspended and revoked, and he switched positions with the other occupant under circumstances, which would suggest he was aware that the police were present. The vehicle was a rental car with no documentation is another finding that the court made, and that the vehicle had exterior damage indicating to the officer that the vehicle had been possessed for a lengthy period of time. So those are findings that the trial court made that this court needs to defer to. I do want to address the reasonable suspicion. The state believes it comes down to about five different sections. And even if, as the Sadiq court said, which is a Supreme Court, I'm sorry, is a Fourth District case, and it is citing a United States Supreme Court case, that even potentially innocent conduct may give rise to reasonable suspicion when aggregated. You do not, because it's the totality of the circumstances, you do not get to look at each individual thing and say, oh, that's innocent, that's innocent, that's innocent, and therefore ignore it all because when they come together, it may mark reasonable suspicion. So the four things that I'm sorry, the five things that we believe add to reasonable suspicion in this case is, first of all, the rental car. There was damage to it. There's no rental agreement. It's a third party rental that the person is not even present. So it's not a third party rental where somebody else is driving, but the renter is there. The defendant doesn't, it says it was rented for him, but doesn't know where it was rented from. And that is, that's beyond just being a rental car. This is a rental car that the officer wasn't even able to confirm with Hertz, whether it was properly rented because defendant didn't have a rental agreement and the officer wasn't able to get through to Hertz. The second issue is the evasive actions. We have not only pulling into the gas station, but pulling up to gas pumps, not getting gas, switching drivers. Then, as the justice pointed out, finding out that the person that was originally driving was suspended. So, okay, maybe people switch cars at gas stations. But now you've got the added situation of the suspended driver's license. You then have passing another gas station, moving lanes, and going into yet a third gas station. And none of that would be, that's evasive action. And the cases indicate that that can be, that can add to reasonable suspicion. The third thing is it's a high crime area. And not only do we have the drug area, but we have the officer's testimony that he's in the area with the hotels, where he sees the defendant and the female, the person who ends up being the female driver later. There are issues with crime at those hotels. So it's not just the drug trafficking of that one street, but we have the issues with the, we have issues in the hotel area. In addition, we have the officer's testimony that the female driver was shaky and nervous while the defendant appeared calm. That is one factor. While, yes, she was laughing, nervous laughter is a thing. And the officer was the one that was actually interacting with her. And he felt that she was nervous. Just out of curiosity, you watched the videos, I'm sure. Did you find any of her behavior objectively? Did you find that to be nervous acting? Not as nervous as some can appear. But I do understand the laughter, her interaction, her movements, her answering his questions. I could see that the officer could find in comparison to the defendant, which is what he was doing when he testified. She was nervous compared to the defendant. That is not the strongest factor in the reasonable suspicion. And I will agree with that, Your Honor. Okay, thank you. Yes. And then the final thing is the information that the defendant and the female were providing. And I think, Your Honor, did identify much of the points that we make. She lies about him driving, however. She also, the claim that he's in the area looking for work, but she's saying she's driving him and works for him by driving him. And her hesitation when identifying him as her boyfriend. That is a factor of the nervousness as well. But there is a palpable hesitation in describing her relationship with him. So when you take all of those things in the aggregate and you look at all of them together, which is what the standard requires, not looking at them individually, we believe that there has been a showing that there was reasonable suspicion. Because there was reasonable suspicion, the officer could continue his investigation. The canine got there and did alert. So we would ask that you affirm the conviction if you even reach that issue. Thank you, counsel. Before we move to counsel's rebuttal, Justice Barberis or Justice Vaughn, do you have any questions? I have no questions. All right. Well, thank you, counsel. Go right ahead with your rebuttal, Ms. Shaheen. Thank you. To begin with the first issue, People v. Weaver is more applicable in the situation of a stipulated bench trial, or it's more true to the purpose behind a stipulated bench trial. So we would ask this court to follow People v. Weaver and find that the suppression issue has been preserved. The reason for that is when you enter into a stipulated bench trial, you have negotiated for that. And under Mueller, the negotiation gets you nothing. You are getting the same thing that you would have gotten if you just pled guilty. Whereas under Weaver, you're preserving an issue for appeal. So that's the exchange. And so that's why we ask this court to follow Weaver. Let me stop you there to that. I mean, wouldn't you say it's a fair assessment that these types of stipulated bench trials are done specifically to protect an appealable issue for a defendant? Yes, I would. Let me just ask you one question with regard to the state's position. If we find that Mueller is instructive and should be followed and we follow Mueller as opposed to Weaver, do you agree then that we don't reach the Fourth Amendment issue at all? If you follow Mueller, yes. Okay. So moving on to the Fourth Amendment issue. So kind of getting into what the state listed with the third-party rental issue, because the People v. Casino has dealt with this. After you've heard back from dispatch that the car is clear, the rental car is clear, what you're doing at that point when you're trying to find out if the person's an authorized driver is inserting yourself into a civil contract. And the court in Casino stated that there was no connection between being a third-party driver and being an unauthorized driver in criminal conduct. So that can't support reasonable suspicion. In that case, was the third-party renter present in the vehicle? No. And I believe the officer never sought that information, which actually happened in this case, too. Officer Johnson never really asked many questions about the third-party renter. He never asked. He didn't. He didn't try to reach them either. Right. And that was from a federal case called Drakeford. You can't take a person's background or what you know now and look through that lens and have everything come down to being evasive. I think, you know, especially going to different gas stations, Schrader explained that. She explained that she looks for a specific type of cigarette pack, and she knew that she was checking the gas station to see if it had it. Did she go into all those gas stations? No, but presumably, maybe she knows that one of the gas stations doesn't have that pack. Why would she stop at that particular gas station, which is what I think just Barbaras was going to ask? Yeah. Oh, the first gas station. Well, you're suggesting if she knew that one of them did not sell that pack of cigarettes, why would she stop there then? That was my question. Oh, I'm sorry. So there were three gas stations. The first gas station, they did go into the mart and they didn't have the cigarettes, but that's not on video. And so the second gas station, they went right by, presumably because they know that that certain pack of cigarettes is not in there. And then they go, they pull into the station where the actual stop occurs. So it's not really remarkable either, because many people would engage in the same behavior looking for a pack of cigarettes, a specific pack of cigarettes. And to the state's point about we're in the drug trafficking neighborhood because of the hotels, I think the argument stays the same for the fact that it's not you can't base reasonable suspicion on being in a drug trafficking neighborhood. You know, that's not that's not something that can support reasonable suspicion. Am I able to continue? Yes. Okay. I was going to make the request for you from justice. So, yes, please. Thank you. Again, the video refutes Schrader being nervous and Burton being calm. And even if it didn't, Officer Johnson testified that he expects drivers to be more nervous than passengers when they get pulled over. So that was unremarkable and couldn't be the basis of reasonable suspicion. So I think I think the state tries to make the point that you have to look at everything in the aggregate aggregate. But we're saying we're looking at everything in the aggregate and there's still zero here. There's still not reasonable suspicion here. And just like in the cases I cited where there was a list of things similar to this case, including discrepancies between passenger and driver and including nervousness and unusual driving. The this this this court has found before that it's not enough for reasonable suspicion. So let me let me point point you to page 11 of the reply brief you you have in there that the state's argument concerning stopping at gas pumps and just Johnson's testimony that is contradicted by the video, which does not show them approaching the gas pumps at the first stop. Do they not stop in front of gas pumps and not pump gas or do they go into a parking spot at the station? Your Honor, that's not on the video. The record is. The record does not indicate whether they they went in. But I'm just curious. The stop, I think, is. Tell me if I'm wrong. Is the stop not on video? Not the stop. But when the defendant's vehicle. While he's driving, when they switch seats, did they pull into a gas station? Yes, I believe so. Yes. Did they pull up to the pump as though you were going to they were going to pump gas or did they pull into a parking spot? And is that on video? That's not on video. And I'm not sure. OK, another thing on that same page. Schrader and Burton respond differently. Johnson testified that Schrader and Burton responded differently to the same questions regarding their destination, which the site state sites to establish reasonable suspicion. However, the video actually shows the Burton Schrader gave the same answer. Is that, in fact, what happened on the video? They they both knew immediately where they were going, why they were going there or whatnot. Correct, I believe. So the first time he asked both of them, Burton states and we're going to my brother's house in Troy. And then when traders out of the car after the 14 minute mark, he's asking her about their destination. She says brother's house in Troy. And they even talk about what they're going to be doing there. And she mentions that he has kids and other things like that. Justice Barbera, Justice Vaughn, any other questions? No questions. Thank you. All right. Well, thank you, counsel. Obviously, we will take the matter under advisement. We will issue an order in due course.